25

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

DEC 2 7 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| ROSALINDA SALAZAR AND | § | |
| JESUS SILVA SALAZAR | § | |
| | § | |
| vs | § | C.A. NO. B01 105 |
| | § | |
| BASILIO GOMEZ SR., CITY OF | § | |
| BROWNSVILLE AND CARLOS ZAMORRANO | § | |
| ARNOLD GALVAN, OSCAR LARA, ADRIAN | § | |
| MASCORRO, AND REY LOPEZ INDIVIDUALLY | § | |
| AND IN THEIR OFFICIAL CAPACITY | § | |
| AS EMPLOYEES | § | |
| FOR CITY OF BROWNSVILLE | § | |

## PLAINTIFF'S RULE 7 (A) REPLY TABLE OF CONTENTS

I.      Nature and stage of Proceedings

II      Basis to deny Qualified Immunity

III     Issues to be Ruled on by the Court
        A.  Whether Plaintiff alleged deprivation of actual constitutional right
        B   Whether right was clearly established

IV      Evidence in support of Reply

V       Statement of Facts

VI      Summary of Argument

VII     Conclusion

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ROSALINDA SALAZAR AND | § | |
| JESUS SILVA SALAZAR | § | |
| | § | |
| vs | § | C.A. NO. B01 105 |
| | § | |
| BASILIO GOMEZ SR., CITY OF | § | |
| BROWNSVILLE AND CARLOS ZAMORRANO | § | |
| ARNOLD GALVAN, OSCAR LARA, ADRIAN | § | |
| MASCORRO, AND REY LOPEZ INDIVIDUALLY | § | |
| AND IN THEIR OFFICIAL CAPACITY | § | |
| AS EMPLOYEES | § | |
| FOR CITY OF BROWNSVILLE | § | |

## PLAINTIFF'S RULE 7 (A) REPLY
## TABLE OF CITATIONS

Cases

Eugene v. Alief Indep. School Dist. 65 F 3d 1299 (5th Cir. 1995)

Anderson v. Creighton 483 US 635 (1987)

Schultea v. Wood 47 F 3d. 1427 (5th Cir. 1995).

Babb v Dorman 33 F Ed 47 (5th Cir. 1994)

Hunter v. Bryant 502 US 224, 1991.

Goodson v. City of Corpus Christi, 202 F3d 730 (5th Cir. 2000.)

Hale v. Townley, 45 F 3d 914, (5th Cir. 1995)

Harris v. Chanclor, 537 F. 2d 203, (5th Cir. 1976.

Crowder V. Sinyard, 884 F. 2d 804 (5th Cir. 1989)

Sanders v. English, 950 F.2d 1152, (5th Cir. 1992).

Brawner v. City of Richardson, 855 F.2d 187 (5th Cir. 1988)

2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ROSALINDA SALAZAR AND | § | |
| JESUS SILVA SALAZAR | § | |
| | § | |
| vs | § | C.A. NO. B01 105 |
| | § | |
| BASILIO GOMEZ SR., CITY OF | § | |
| BROWNSVILLE AND CARLOS ZAMORRANO | § | |
| ARNOLD GALVAN, OSCAR LARA, ADRIAN | § | |
| MASCORRO, AND REY LOPEZ INDIVIDUALLY | § | |
| AND IN THEIR OFFICIAL CAPACITY | § | |
| AS EMPLOYEES | § | |
| FOR CITY OF BROWNSVILLE | § | |

**PLAINTIFF'S RULE 7 (A) REPLY**

Comes Now Rosalinda Salazar and Jesus Silva Salazar, Plaintiffs herein, and makes and files this their Rule 7(a) Reply and for good cause would show the Court the Following:

I

NATURE AND STAGE OF PROCEEDINGS

This is Plaintiffs Rule 7(a) reply to Defendant City and employees defense of qualified immunity asserted by Defendants Carlos Zamorrano, Arnold Galvan, Oscar Lara, Adrian Mascorro and Rey Lopez. Plaintiffs alleges they suffered substantial injuries when they were wrongfully arrested, assaulted, the victims of excessive force by these officers and wrongfully charged with criminal conduct as part of a conspiracy between themselves and Defendant Gomez. Plaintiffs further allege that as a result of an ongoing conspiracy between Defendants Gomez, the individual defendants, then City Manager Carlos Rubenstein, Building Inspector Santiago Navarro and others whose specific identity is unknown pending further discovery, the plaintiffs civil rights were violated by the policies and practices of the Defendant City in encouraging permitting or authorizing its law enforcement officers to conduct illegal arrests and use excessive force as well as allowing knowing violations of city ordinances involving health and safety and building issues to go unpunished.  Plaintiffs further allege that the defendants Zamorrano Mascorro, Lara, Lopez

3

and Galvan arrested them in retaliation for embarrassing these defendant officers and fellow
officers, Manual Lucio and Mariano Gonzales during their prior testimony in depositions and or
trial and acted with malice. Plaintiff, Jesus Silva received severe injuries to his back, shoulder,
ribcage and head, due to the excessive force received prior to the arrest where he was hit and
kicked by the defendant officers. Such injuries required emergency medical treatment and ongoing
medical treatment, physical therapy, and medical studies, while the injuries of Rosalinda Salazar
suffered injuries to her shoulders, wrists and arms when she was arrested . This cause is still in
the discovery stage.

## II

## BASIS TO DENY QUALIFIED IMMUNITY

The defendant police officers are not entitled to qualified immunity for the federal claims
against them because they individually and collectively violated the civil rights of the plaintiffs to
be free of unlawful seizure without probable cause, in violation of oral, written or understood city
policies and procedures Defendants are not entitled to qualified immunity for retaliating against
the Plaintiffs for exercising their rights to seek redress in the civil courts or retaliating against the
Plaintiffs for exercising their rights of free speech for reporting health, safety and building
violations to the Defendant City regarding Defendant Gomez and his operation of his business.
Defendants are not entitled to qualified immunity when they used excessive force before during
and or after the arrest which caused significant injuries.

## III

## ISSUES TO BE RULED ON BY THE COURT

The issue before the Court is whether the individual defendants, Galvan, Lopez, Lara,
Mascorro and Zamarrano are entitled to qualified immunity. The defendants are not entitled to
qualified immunity if there was an objectively unreasonable violation of clearly established
constitutional rights for their federal claims. Eugene v. Alief Indep. School Dist. 65 F 3d 1299
(5th Cir. 1995). A right is clearly established only when its contours are sufficiently clear that a
reasonable public official would have realized or understood that his conduct violated the right in
issue not merely that the conduct was otherwise improper.    Anderson v. Creighton 483 US
635 (1987). In order to be entitled to qualified immunity at the Rule 7 Reply stage there must

4

clearly be no basis supporting plaintiffs claims or there are indisputably meritless legal theories being offered. Schultea v. Wood 47 F 3d. 1427 (5th Cir. 1995).

A.     Whether Plaintiff alleged deprivation of actual constitutional right

Plaintiffs allege they were arrested without probable cause and were subjected to excessive force before during and after the arrest. Plaintiffs have constitutional rights under the fourth amendment to be free from seizure without reasonable suspicion, arrest without probable cause and excessive force.  Plaintiff Jesus Salazar alleges in the Original Complaint, First Amended Complaint and more specifically in his affidavit attached hereto and made a part of this response he was seized without reasonable suspicion, arrested without probable cause and was the suffered injuries which resulted from force that was clearly excessive and that excessiveness was objectively unreasonable. Plaintiff Jesus Silva alleges he was beaten and assaulted after he put his arms up and was forced to the ground. Plaintiff also alleges he sustained significant injuries to his shoulders, back and ribcage from the excessive force used on him. Plaintiff Rosalinda Salazar alleges she was arrested without probable cause, and excessive force used to arrest her caused her significant injuries to her arms, wrists and shoulder when she was handcuffed and the cuffs tightened excessively.  Plaintiffs also allege the deprivation of their constitutional rights of free speech were violated when he was retaliated by the City officials  for making complaints about the Gomez Flea market and the various departments of the City refusal to act.   Plaintiffs have also alleged the right to be free from bad faith or malicious prosecution as a constitutional right.

B   Whether right was clearly established

In suits alleging illegal arrests the determination of qualified immunity turns on whether a reasonable officer could have believed the arrest to be lawful, in light of clearly established law and the information the officer possessed.  Babb v Dorman 33 F Ed 47 (5th Cir. 1994). The defense gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law. Hunter v. Bryant 502 US 224, 1991.  Plaintiffs claim they were unlawfully arrested, subjected to excessive force and retaliated against for exercising their free speech and access to the courts. The right to be free from unlawful arrest and not to be subjected to excessive force were clearly established prior to April 2000.  Plaintiffs have a fourth amendment right to be free from unlawful detention and excessive force.   Goodson v. City of

Corpus Christi, 202 F3d 730 (5th Cir. 2000.) Courts have also held that an officer who is present at the scene and does not take reasonable measures to protect a suspect from another's use of excessive force may be liable under section 1983. Hale v. Townley, 45 F 3d 914, (5th Cir. 1995), Harris v. Chanclor, 537 F. 2d 203, (5th Cir. 1976.   Courts have held that if state officials in some way retaliate against an individual for seeking redress through the Courts, they have violated that persons right of access to the Courts. Crowder V. Sinyard, 884 F. 2d 804 (5th Cir. 1989).

To succeed on an excessive force claim, the plaintiff must prove (1) an injury, (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable. Goodson at 740.   The constitutional right to be free from bad faith or malicious prosecution is sufficient to support a damage judgment against state law enforcement officials under 42 U.S.C § 1983. Goodson at 740 citing Sanders v. English, 950 F.2d 1152, (5th Cir. 1992).

IV

EVIDENCE IN SUPPORT OF REPLY

Plaintiff would show the Court no discovery has been had regarding the specific policies and practices of the City, nor the training, customs, procedures of City employees and such would supplement and support further Plaintiffs claims. In support of Plaintiffs response, the following are incorporated for all purposes:

1. Affidavit of Jesus Silva Salazar

2. Affidavit of Rosalinda Salazar

3. Trial Testimony excerpts of Manual Lucio

4. Trial Testimony excerpts of Mariano Gonzales,

5. Deposition excerpts of Carlos Zamorrano

6. Motions and Order to Dismiss misdemeanor charges of Jesus Silva Salazar

7. Indictment of Jesus Silva Salazar

8. Order of dismissal of felony charges of Jesus Silva Salazar

9. Doctor Perez note of surgery for Jesus Silva Salazar

10. Prescription for MRI and Ct Scans for Jesus Silva Salazar

11. Deposition testimony of excerpts of Basilio Gomez Sr.

6

# V
## STATEMENT OF FACTS

Plaintiffs have resided and operated the same at the same address for over ten years. Plaintiffs were open for business seven days a week for the sale of tractor trailer rigs. Plaintiffs had complained to City of Brownsville departments about the Gomez flea market, by calling different departments of the City including, Police, Health and building for various reasons including the odors, disposal of sewage, dust and trash blowing from Gomez property and the failure to pave the easement Defendant Gomez operates a flea market adjacent to the property of Plaintiffs. Defendant Gomez has an easement which he allows the flea market customers to use without restriction as to time or day. Plaintiff requested numerous times that Gomez close the easement during the week or at night, to which Gomez refused. See affidavit of Jesus Salazar and Rosalinda Salazar. On or around 1995, Gomez began to hire Brownsville Police officers to work for him. These officers would work when they were off duty to provide security and to control traffic. They were paid by the hour and would perform the work as assigned by Mr. Gomez. They were under his control and guidance during this time. See Gomez deposition excerpts. The defendants in this case, Zamorrano, Galvan, Lara, Lopez and Mascorro were working off duty as part of Mr. Gomez security and traffic control employees.

Zamorrano, Mariano Gonzales, Manual Lucio, Gilbert Gonzales, Jesus Pinales had been deposed or given trial testimony in regards to the litigation of January 1999 filed in the 357th District Court, Cameron County. These officers were identified as persons with knowledge of relevant facts by Gomez, regarding the allegations of interference of the easement by Jesus Silva Salazar, Rosalinda Salazar and Juan Silva Salazar. The officers testimony revealed blatant efforts to assist Mr. Gomez in the lawsuit by saying they saw water running on the easement but did not see who placed the hoses there. See Lucio and Zamarrano depositions. At the trial of the merits of this case, Mariano Gonzales and Manual Lucio testified. See trial transcripts of their testimony. The testimony was so incredible, the jury disbelieved all of it and returned with a verdict in favor of Jesus Silva Salazar in less than one hour. Within two months of this embarrassment to Gomez and his offduty officers, the incident made the basis of this suit occurred.

Lara and Lopez knew Jesus Silva Salazar well prior to the incident. See Jesus Silva

7

Salazar Affidavit. On numerous prior occasions, Lopez, Lara, Gonzales, Zamarrano, Mascorro and Galvan had refused to allow entry to the driveway and business by   Plaintiffs, their family members and customers. Discussions had been carried on between Jesus Silva Salazar and Lopez and Lara about not allowing entry. No resolution was had. Discussions were had between Salazar lawyer and Chief of Police Reyna and Commander Randy Dunn about the traffic problems, the illegal parking and difficulty of the Salazars to enter their premises.  See affidavit of Jesus Silva Salazar. On the date of the incident, Plaintiff Jesus Silva Salazar left his premises in a highly conspicuous vehicle, a 1999 white Ford 4 by 4 Pickup truck with large tires and raised body. Jesus Silva Salazar motioned to Lopez and Lara that he intended to return shortly which Lopez and Lara acknowledged.  Upon his return, Jesus Silva Salazar drove up to the easement on the improved frontage road as traffic was stopped on the frontage road by Lopez and Lara. Exiting traffic yielded and allowed Mr. Salazar to pass the easement and enter his driveway. At no time did Mr. Salazar come near or close to Lara or Lopez.  Upon entering his driveway, Mr. Salazar noticed Lopez and Lara following him onto his property yelling at him. Knowing these two persons to be employed by Gomez as traffic control guards, he ordered off his property. Lopez and Lara then approached Silva with their batons drawn and continued to yell at him. Mr. Salazar recalled that the officers had testified at trial only a few months before that they did not issue tickets or engage in arrests while working off duty. Mr. Salazar believing these two persons were on his property without permission continued to tell them to leave. As he directed them off his property, Mr.Salazar saw he was going to be hit by Lara, he blocked the hit and Lopez came from behind and hit Mr. Salazar in the back. Mr. Salazar then went back and placed his hands on the tailgate of his pickup truck, about five feet in the air.  At no time after this was there any effort or indication that Mr. Salazar was not cooperating or refusing any instruction.  At this time, Lopez and Lara began to hit, knee and beat Mr. Salazar. Mr. Salazar was forced to the ground and Lopez then handcuffed him forcibly pulling his arms to inflict more pain and injuries.   Lara then asks for the golf cart to be brought to carry Mr. Salazar away.  Rosalinda Salazar fearing for her husbands safety and welfare locks the gate. Mascorro, Zamarrono and Galvan jump the gate and appear at the scent. Mr. Salazar is handcuffed on the ground, face down. Mr.Zamarrano comes up Mr. Salazar, kneeing him in the back, pulling him by the hair, taunting him. Mr.

8

Mascorro and Galvan did nothing when they saw Zamarrono knee Mr. Salazar and pull his head up. They did nothing although they saw the excessive force used on Mr. Salazar by Lara, Lopez and Zamarrano.

Mr. Zamarrano then went to Rosalinda Salazar to order her to open the gates. Mrs. Salazar could not locate the keys in her office or her home. After searching for the keys for over ten minutes she found what appeared to be the key and went to the gate. It was not the right key. Three onduty officers appeared at the scene some 30 to 45 minutes after the initial incident occurred. The supervising officer by the last name of Bennett, without explanation told Zamarrano to arrest Rosalinda Salazar. She was physically grabbed and handcuffed. She complained that the handcuffs were too tight but to no avail. She was taken to jail and processed. She was bonded out about an hour after being arrested. She was charged with interfering with a public servant. Such charges were dismissed by District Attorney.

Meanwhile Mr. Salazar laid handcuffed on the ground without medical attention until and ambulance arrived. He was taken to the hospital and then to jail. He was processed, charged with numerous offenses and bailed out that same day. Mr. Salazar was initially charged with six offenses and placed on bond. Subsequently the charges were dismissed and he was indicted on Aggravated assault and three counts of assault on a peace officer. Those charges were later dismissed and he pled no contest to a Class A simple assault which he received deferred adjudication. That case has been dismissed as of November 28, 2001 after the Court granted an early termination of the probated sentence as part of deferred adjudication.

Plaintiffs allege unlawful detention without reasonable suspicion, unlawful arrest without probable cause, use of excessive force, retaliation for exercise of free speech and access to the courts were clearly established rights which were violated. Plaintiff further alleges the City's customs, practices, policy and procedures in encouraging, authorizing or permitting its law enforcement officers to moonlight and engage in illegal detentions and arrests and in the use of excessive force amounted to a deliberate indifference to its known or obvious consequences and that this policy was the moving force behind the constitutional violations.

VI

SUMMARY OF ARGUMENT

Plaintiffs exercised their constitutional right to free speech and access to the courts when they reported Gomez operations to the respective department heads, including the police department. Within two months of exercising their right to access to the Courts and during such access, showing the factfinder the obvious bias and favoritism exhibited by the City including the police department, Plaintiffs were arrested at their home for doing the same thing they had done hundreds of time prior to this litigation. Plaintiffs actions were a matter of public concern and their speech was protected. Brawner v. City of Richardson, 855 F.2d 187 (5th Cir. 1988). Such right of free speech was clearly established prior to 1988. Id. The defendants, Galvan, Lopez, Lara, Mascorro and Zamarrano were objectively unreasonable because there was no reasonable suspicion nor probable cause to have detained the Plaintiff. The defendants Galvan, Lopez, Lara, Mascorro and Zamarrano were objectively unreasonable in using excessive force after Mr. Salazar was subdued and on Mrs. Salazar whom never failed to cooperate. The malicious prosecution claims supports a damage judgment or enough evidence to bring to a jury when the charges against both plaintiffs were dismissed. If nothing else there may be factual issues as to the existence of probable cause that must be determined. The city's practices, policies and procedures whether written or adopted allowed the officers to work off duty, to engage in illegal detentions and arrests and to use excessive force by encouraging, permitting and authorizing such conduct by its acts or omissions.

VII

CONCLUSION

The defendants, Galvan, Mascorro, Lopez, Lara and Zamarrano are not entitled to qualified immunity. The defendants unreasonably violated well established constitutional rights of the Plaintiffs by the illegal detention, unlawful arrests and use of excessive force and by retaliating against them for exercising their right of free speech and seeking access to the courts and their conduct was not objectively reasonable.

Wherefore Plaintiffs pray that the court deny the Motion to Dismiss and to allow discovery to more fully respond to the qualified immunity defenses.

Respectfully Submitted,

10

VILLEGAS LAW FIRM
BY: ALBERT VILLEGAS
1324 EAST SEVENTH STREET
BROWNSVILLE, TEXAS 78520
TELEPHONE:  (956) 544-3352
TELECOPIER: (956) 544-7828
STATE BAR NO: 20585450
Federal ID NO. 3903
ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been sent to counsel of record on this the 27th day of December, 2001 via regular mail.

ALBERT VILLEGAS

11

1           REPORTER'S RECORD

2        VOLUME 2 OF 2 VOLUMES

3      TRIAL COURT CAUSE NO. 98-11-4333-E

4   - - - - - - - - - - - - - - - - x
                                     :
5   BASILIO C. GOMEZ, SR., ET AL    : IN THE DISTRICT COURT
                                     :
6   VS.                             : 357TH JUDICIAL DISTRICT
                                     :
7   JESUS SILVA SALAZAR AND         :
    JUAN ANTONIO SILVA SALAZAR      :
8                                    : CAMERON COUNTY, TEXAS
                                     :
9   - - - - - - - - - - - - - - - - x

10

11     TRIAL ON THE MERITS - TESTIMONY OF MANUEL LUCIO

12

13          On the 20th day of January, 2000, the

14   following proceedings came on to be heard in the

15   above-entitled and numbered cause before the Honorable,

16   Antonio Cantu, Judge Presiding, held in Brownsville,

17   Cameron County, Texas.

18          Proceedings reported by machine shorthand.

19

20

21

22

23

24

25

                                          COPY

CYNTHIA L. GARZA, CSR, RMR

Ex3

1                    P R O C E E D I N G S

2                    MR. QUINTANILLA:  Yeah.  We now call

3      Detective Manuel Lucio, who is already sitting.

4                    THE COURT:  All right, sir.  I haven't

5      sworn you in, have I?

6                    THE WITNESS:  No, sir.

7                    **(The witness was sworn in by the Court.)**

8                    THE WITNESS:  I do.

9                    THE COURT:  Have a seat, please.

10                   **MANUEL ENRIQUE LUCIO,**

11        having been first duly sworn, testified as follows:

12                      **DIRECT EXAMINATION**

13     **BY MR. QUINTANILLA:**

14          Q.    State your full name for the record, please.

15          A.    Manuel Enrique Lucio.

16          Q.    Mr. Lucio, how are you employed, sir?

17          A.    Employed as a police officer for the City of

18     Brownsville.

19          Q.    And what is your position with the Police

20     Department?

21          A.    Investigator for the Burglary Division.

22          Q.    Is your title detective?

23          A.    Yes, sir.

24          Q.    Detective, how long have you been employed with

25     the City of Brownsville with the Police Department?

CYNTHIA L. GARZA, CSR, RMR

1    never seen a car parked there.

2        Q.   Okay.  And would the jury be correct in

3    assuming that every time you saw cars parked illegally on

4    that frontage road you went out and cited them?

5        A.   No, sir.

6        Q.   That's right, you didn't, did you?

7        A.   No, sir.

8        Q.   When you are on duty, you do go out there and

9    cite folks on that parking illegally, correct?

10       A.   Not on the frontage, no, sir.

11       Q.   But you threatened Mr. Silva with a citation

12   when you are off duty if he didn't move that truck,

13   didn't you?

14       A.   I asked him to move it or I would call the unit

15   and the unit would take care of it, I believe something

16   like that.

17       Q.   No, no.  Let's remember your deposition when

18   you told us in your deposition, you remember we asked you

19   in your deposition and you told us that you specifically

20   told us --

21            MR. QUINTANILLA:  What page?

22            MR. VILLEGAS:  I am not reading from any

23   page.

24       Q.   (BY MR. VILLEGAS) Do you remember that you

25   told us before that you told Mr. Silva, "move it or I'll

1    what you said back on May of '99?

2        A.    After you refreshing my mind there, I remember

3    that, that I had told him to move it and that he would be

4    getting a citation if he did not.

5        Q.    Not that he would get a citation, but that you,

6    that you were going to cite him.

7        A.    That's correct.

8        Q.    An off-duty police officer?

9        A.    That's correct.

10       Q.    But you told the jury a few minutes ago, "I

11   don't cite.  I don't give citations to all those cars

12   because I am off duty."

13       A.    I don't.

14       Q.    But now you are coming and threatening this

15   man, "I am going cite him."

16       A.    I did tell him that.

17       Q.    But I am not going cite his customers?

18       A.    Did I tell him that?

19       Q.    Right.  You cited Mr. Silva, but you wouldn't

20   cite your employer's customers; is that correct?

21                    MR. QUINTANILLA:  Your Honor, he is

22   badgering the witness.  It's argumentative.

23                    THE COURT:  Overruled.

24       Q.    (BY MR. VILLEGAS) Is that correct?

25       A.    I did tell him that, yes, sir.

1      A.    Yes, sir.

2      Q.    Nothing would block your view of all the cars

3 parked on the frontage road?

4      A.    No, sir.

5      Q.    Now, three officers, since you all are all off

6 duty, do you all share the same sentiment about not

7 giving tickets while you are off duty?

8      A.    I guess it would be up to each officer.

9      Q.    So there is a policy from Brownsville Police

10 Department, you know, you are going to -- we are all

11 going to be the same.  Either do or don't.  Do whatever

12 you want?

13      A.    Not that I know of, sir.

14      Q.    Sir?

15      A.    Not that I know of, sir.

16      Q.    Thank you.  Three different officers all see

17 these cars parked in the frontage road, three different

18 officers choose not to call the Police Department or give

19 tickets, wouldn't you agree if that's happening, that

20 that can smell of favoritism?

21            MR. QUINTANILLA:  Your Honor, that has

22 been asked and answered four or five times already.

23            THE COURT:  Sustained.

24            MR. VILLEGAS:  No, your Honor.  I said

25 three police officers working.

1    A.    Yes, sir.

2    Q.    You think he did?

3    A.    Yes.

4    Q.    I'm sorry, can't hear you, man.  You need to
5    move the mike or something.

6    A.    It doesn't stay up.

7    Q.    You think you go because he saw you?

8    A.    Yes, sir.

9    Q.    You told us a while ago that's an assault,
10   right?

11   A.    I don't think I said that.

12   Q.    Oh, I'm sorry.  Isn't it an assault?

13   A.    It would be construed as assault.

14   Q.    What, you are an off-duty police officer.  Do
15   you decide which laws are serious enough to arrest
16   somebody and which ones aren't?  In other words, if you
17   see somebody when you are on duty that's committing an
18   assault, and you see somebody off duty committing an
19   assault, you have different standards?

20   A.    No, sir.

21   Q.    Okay.  For the benefit of the jury, somebody
22   gets you wet intentionally with the harm, with the
23   intentional intention to get you wet, isn't that an
24   assault?

25   A.    Depends.

CYNTHIA L. GARZA, CSR, RMR

1    A.    I am adding.  This is what I am telling you.  I
2  am telling you this is where his hands were.
3    Q.    I understand, but I see you kind of closed fist
4  here?
5    A.    I am getting up.
6    Q.    He had his -- clenched his fist?
7    A.    No, sir.
8    Q.    You didn't feel threatened when you say that,
9  didn't you?
10    A.    No.  He was inside his property.
11    Q.    Well, so what?
12    A.    So --
13    Q.    You can't -- I'm sorry.
14    A.    Go ahead.
15    Q.    You can't arrest somebody that's in their
16  property; is that what you are telling the policeman --
17  I'm sorry, that's what you are telling the jury as a
18  policeman?
19    A.    I have my discretion to do that.
20    Q.    I understand.  But you are not telling the
21  jury, "sorry, I can't arrest somebody because he just
22  assaulted me and he ran to his property."  You are not
23  saying that, are you?
24    A.    No, sir.
25    Q.    You had the ability to do it if you felt

CYNTHIA L. GARZA, CSR, RMR

1

1  REPORTER'S RECORD

2  VOLUME 1 OF 2 VOLUMES

3  TRIAL COURT CAUSE NO. 98-11-4333-E

4  - - - - - - - - - - - - - - - -x

5  BASILIO C. GOMEZ, SR., ET AL    : IN THE DISTRICT COURT

6  VS.                             : 357TH JUDICIAL DISTRICT
                                    :
7  JESUS SILVA SALAZAR AND
   JUAN ANTONIO SILVA SALAZAR      :

8                                  : CAMERON COUNTY, TEXAS
                                    :
9  - - - - - - - - - - - - - - - -x

10

11  TRIAL ON THE MERITS - TESTIMONY OF MARIANO GONZALEZ

12

13         On the 19th day of January, 2000, the

14  following proceedings came on to be heard in the

15  above-entitled and numbered cause before the Honorable,

16  Antonio Cantu, Judge Presiding, held in Brownsville,

17  Cameron County, Texas.

18         Proceedings reported by machine shorthand.

19

20

21

22

23

24

25

CYNTHIA L. GARZA, CSR, RMR

Ex 4

1      **P R O C E E D I N G S**

2              THE DEPUTY:  Bring him in?

3              THE COURT:  Mariano, what is the last

4    name?  Have I sworn you in yet?

5              THE WITNESS:  Yes, your Honor, you have.

6              **MARIANO GONZALEZ, JR.,**

7      having been first duly sworn, testified as follows:

8                    **DIRECT EXAMINATION**

9    **BY MR. QUINTANILLA:**

10         Q.   State your full name for the record, please.

11         A.   Mariano Gonzalez, Jr.

12         Q.   Mr. Gonzales, how are you employed?

13         A.   I am a police officer, City of Brownsville.

14         Q.   And how long have you been a police officer

15    with the City of Brownsville?

16         A.   Eighteen years.

17         Q.   What division do you work in?

18         A.   I am currently assigned to the South Texas Auto

19    Theft Task Force.

20         Q.   And how long have been assigned to that task

21    force?

22         A.   Since it was created I believe back in '93,

23    '94.

24         Q.   And since '93 or '94, you have been working

25    continuously with that task force?

1      A.   I never had a conversation with Mr. Silva.

2      Q.   You've never had a dispute with him?

3      A.   I have never had one with him.

4      Q.   You never had a dispute with him?

5      A.   I never had a dispute with him.

6      Q.   And so you've never had any difference of

7 opinion on anything because you've never talked to him?

8      A.   I have never talked to that man.

9      Q.   Okay.  Now, do you instruct those officers that

10 are working at the flea market as security that if

11 Mr. Silva comes and complains, to tell them to call the

12 Police Department, not to bother with him?

13     A.   No.

14     Q.   What do you instruct those other police

15 officers when dealing with Mr. Silva or over the past two

16 years?  And you are under oath, sir.

17     A.   It's up to them, depending on the situation at

18 the time.

19     Q.   So each -- how many police officers work out

20 there at the flea market?  Six, seven, ten?

21     A.   About seven to ten.

22     Q.   Okay.  So Mr. Silva approaches these police

23 officers, he can get ten responses as to what to do,

24 right?

25     A.   Probably.

1      Q.   Now, if you're on duty, and Mr. Silva comes and

2   complains to you and says, "there is a bank robber over

3   there," are you going to tell him, "go talk to somebody

4   else?"

5      A.   No.

6      Q.   If you're -- I'm sorry.  When other officers

7   are on duty as a Brownsville Police Department, and they

8   get reports of a crime, are they given instructions,

9   "well, you can decide on what you want to do?"

10     A.   No, sir.

11     Q.   They have a specific duty that they are

12  supposed to follow, correct?

13     A.   Yes, sir.

14     Q.   While you're in uniform and working for

15  Mr. Gomez, whatever they want to do is fine with you as

16  senior patrol officer out there?

17              MR. QUINTANILLA:  Your Honor, that's

18  argumentative, your Honor.  Object.

19              THE COURT:  Sustained.

20     Q.   (BY MR. VILLEGAS) And it's acceptable

21  procedure, as far as you running these other security

22  officers, for them to do whatever they feel like at the

23  time in response to Mr. Silva; is that correct?

24              MR. QUINTANILLA:  Your Honor,

25  argumentative as well, your Honor.

CYNTHIA L. GARZA, CSR, RMR

1    are enforcing no parking on that frontage road, correct?

2        A.    There hasn't been any cars parking on the

3    frontage road for the last six, seven months that I can

4    remember.

5        Q.    Well, but before the six or ten months, there

6    had been people parking on the frontage road that went

7    over to the plea market and?

8        A.    On the parking lane, yes.  On occasions, yes.

9        Q.    On the parking lane.  There is a parking lane

10   on the frontage road?

11       A.    Well, on the emergency lane.

12       Q.    The emergency lane, that's not a parking lane,

13   is it?

14       A.    No.

15       Q.    And it's not meant for parking lane, is it?

16       A.    Right.

17       Q.    And that causes dangerous conditions to the

18   traffic that is not going into the flea market that's

19   using the frontage road, correct?

20       A.    Yes.

21       Q.    Did you ever have any of these vehicles towed,

22   Officer?

23       A.    Personally, no.

24       Q.    Okay.  No.  Any of your officers or the

25   officers that were there during security ever have those

1    towed?

2        A.    That I am aware of, no.

3        Q.    Okay.  We had used, mentioned earlier --

4                    MR. PENA:  May I approach the witness,

5    your Honor?

6                    THE COURT:  Yes.

7        Q.    (BY MR. PENA) -- earlier, that you had

8    observed those hoses three to five times when you were

9    driving around the flea market that day, correct?  You

10   remember when Mr. Quintanilla here asked you if these

11   hoses -- is these the hoses that you are referring to, or

12   different ones?

13       A.    Different ones, or it could be the same one.

14       Q.    Plaintiff's Exhibit No. 7, I apologize.

15       A.    Right.

16       Q.    These might be different ones?

17       A.    They could be.

18       Q.    It could be the same?

19       A.    Yes.

20       Q.    All right.  Well, whether it was these or

21   different ones, and there was all this water flowing, and

22   you went by three to five times, you didn't do anything

23   about it?

24       A.    When I say three to five times on that day, no,

25   sir.  On other weekends, you know, three or five

CYNTHIA L. GARZA, CSR, RMR

**1**

C   T: NO. 96-11-4333-E

JESUS SILVA SALAZAR AND )( IN THE DISTRICT COURT
)(
)( OF CAMERON COUNTY, TEXAS
)(
JESUS SILVA SALAZAR AND )(
JUAN ANTONIO SILVA SALAZAR )( 357TH JUDICIAL DISTRICT

---

ORAL AND VIDEOTAPED DEPOSITION OF
CARLOS ZAMORANO
MAY 7, 1999

---

ORAL AND VIDEOTAPED DEPOSITION OF CARLOS

ZAMORANO, produced as a witness duly sworn by me at the

instance of the DEFENDANTS, taken in the above styled

and numbered cause on MAY 7, 1999, from 6:01 p.m. to

6:59 p.m., before CORINNA N. GARCIA, Certified

Shorthand Reporter No. 5210 in and for the State of

Texas, at The Villegas Law Firm, 1324 East 7th Street,

Brownsville, Texas, pursuant to the Texas Rules of

Civil Procedure.

---

**3**

INDEX

PAGE

Appearances ......... .. ..... .. .. .. .. ....   2

CARLOS ZAMORANO

Examination by Mr. Villegas ... .. ...............   4

Examination by Mr. Quintanilla  ................   42

Reexamination by Mr. Villegas  .................   56

Reexamination by Mr. Quintanilla ..... .........   61

Witness Signature Page/Corrections ..............   63

Reporter's Certificate .........................   64

Attached to the end of the transcript:  Stipulations

EXHIBITS
                                    PAGE
NUMBER  DESCRIPTION                 IDEN.

(No Exhibits Marked)

---

**2**

APPEARANCES

FOR THE PLAINTIFF:

    VICTOR QUINTANILLA
    LAW OFFICE OF ERNESTO GAMEZ
    777 East Harrison
    Brownsville, Texas  78520

FOR THE DEFENDANTS:

    ALBERT VILLEGAS
    THE VILLEGAS LAW FIRM
    1324 East 7th Street
    Brownsville, Texas  78521

ALSO PRESENT:

    Jesus Silva Salazar

---

**4**

1                CARLOS ZAMORANO,
2 having been duly sworn, testified as follows:
3                  EXAMINATION
18:01  4 BY MR. VILLEGAS:
18:01  5    Q.  Good afternoon, sir.  Will you state your name?
18:01  6    A.  Carlos Zamorano.
18:01  7    Q.  Sir, you're a Brownsville Police Department
18:01  8 officer?
18:01  9    A.  Yes, I am.
18:01 10    Q.  How long have you been an officer?
18:01 11    A.  A little bit over three and a half years, close
18:01 12 to four.
18:01 13    Q.  And have you ever worked for Basilio Gomez at
18:02 14 the flea market?
18:02 15    A.  Yes, I have.
18:02 16    Q.  How long have you worked there?
18:02 17    A.  The first time I worked for them was, I
18:02 18 believe, in August of '97.
18:02 19    Q.  Okay.  So -- and do you continue to work for
18:02 20 them part-time?
18:02 21    A.  On and off, yes, part-time.
18:02 22    Q.  Okay.  Now, do you know anything about this
18:02 23 lawsuit, sir?
18:02 24    A.  I don't know the specifics of it.  I know that
18:02 25 there has been a -- some kind of a quarrel between

Ex 5

**21**

```
18:18  1  that it had rained or not, 'cause you're telling us you
18:18  2  don't know when it happened.
18:18  3      A.  I can't give you a date.
18:18  4      Q.  You can't tell us a month either.
18:18  5      A.  Well, I wish I could.
18:18  6      Q.  I know, but if you can't, you can't.  And
18:18  7  that's what I want to make sure.  'Cause if it was in
18:18  8  September, like we've got another alleged incident,
18:19  9  there was a major storm right at the end of August.  If
18:19 10  there was another time earlier in the year, at least
18:19 11  we've got an idea.  And that's what I'm saying, since
18:19 12  you cannot tell us whether it was January or any of the
18:19 13  other months of 1998, you can also not discount for any
18:19 14  certainty if it was raining within his area that may
18:19 15  have caused some flooding that was there more than a
18:19 16  period of time, 'cause you don't know when this
18:19 17  happened, right?
18:19 18      A.  (Moving head up and down.)
18:19 19      Q.  I mean, I understand that you're saying it
18:19 20  didn't rain for months; but we don't know when it
18:19 21  happened.  So we can't -- I mean, if we go to the
18:19 22  weather bureau and they tell us it rained at least once
18:19 23  every couple of months or once every month, even if it
18:19 24  was a little bit more in some places, then you're
18:19 25  incorrect as to the month.  We're talking deluge in
```

**22**

```
18:19  1  maybe one area.  I'm trying to understand a specific
18:19  2  time period, and you can't really give us that.
18:19  3      A.  No, I wish I could, but --
18:20  4      Q.  Okay.  And I want you just to tell us what you
18:20  5  remember.  All right.  Now, other than that one hose
18:20  6  incident, any other time that you saw somebody watering
18:20  7  down the easement?
18:20  8      A.  There is -- on and off, but it's nothing --
18:20  9  never been left on like that time.
18:20 10      Q.  Okay.
18:20 11      A.  Yes, I do see them constantly watering the
18:20 12  easement; and I do take it as they're trying to calm
18:20 13  down the dirt.
18:20 14      Q.  Okay.  They didn't ever get you wet, did they?
18:20 15      A.  No, not me.
18:20 16      Q.  You worked along with Mr. -- what was the guy's
18:20 17  name that just left -- Lucio?
18:20 18      A.  Yes.
18:20 19      Q.  Do you work with Lucio?
18:20 20      A.  Yes, I have.
18:20 21      Q.  Did he tell you that he was soaked down by
18:20 22  Mr. Silva?
18:20 23          MR. QUINTANILLA:  Objection to the form.
18:20 24      A.  Not that I recall.
18:20 25      Q.  Okay.  Now, if you're an officer and you're in
```

**23**

```
18:20  1  uniform -- and you work out there in uniform, right?
18:20  2      A.  Yes, I do.
18:20  3      Q.  If somebody soaks you down, they see you and
18:20  4  they soak you down, as an officer, isn't that an
18:20  5  assault on you, if they intentionally do it?
18:20  6          MR. QUINTANILLA:  Object to the form.
18:21  7      A.  Sir, I didn't see -- I didn't see Mr. Lucio.
18:21  8      Q.  Isn't that an assault -- if you were walking
18:21  9  down the street, on your bicycle, and somebody is
18:21 10  watering and they water you intentionally, that's an
18:21 11  assault on you?
18:21 12          MR. QUINTANILLA:  Object to the form.
18:21 13      Q.  Right?
18:21 14      A.  Depending on how the victim takes it.
18:21 15      Q.  Depending on how you take it.  You're the
18:21 16  victim.  You can construe that as an assault.  If I
18:21 17  started to hit you with the water hard enough, you can
18:21 18  fall down and hurt yourself?
18:21 19          MR. QUINTANILLA:  Object to the form.
18:21 20      A.  As hot as it gets out there, I probably will
18:21 21  come down.
18:21 22      Q.  Now, while you were on duty while you're
18:21 23  working -- you never heard of this incident that
18:21 24  occurred with Mr. Lucio, right?
18:21 25      A.  No, I don't remember him saying anything about
```

**24**

```
18:21  1  that.
18:21  2      Q.  If somebody got you wet while you were working,
18:21  3  you know, security, wouldn't you kind of have told --
18:21  4      A.  If I got drenched, yeah.  If I got sprinkled,
18:21  5  well, no.
18:21  6      Q.  Okay.  Now, did you ever meet Mr. Silva Salazar
18:21  7  and have words with him?
18:21  8      A.  We've spoken a couple of times.
18:22  9      Q.  And was he rude to you?  Was he courteous to
18:22 10  you?  Was he belligerent to you?
18:22 11      A.  All of the above.
18:22 12      Q.  Okay.  Was he -- did he accuse you of being
18:22 13  corrupt?
18:22 14      A.  Yes, he did.
18:22 15      Q.  Did he accuse you of not enforcing the law
18:22 16  equally?
18:22 17      A.  If that's what corruption means, yes, sir.
18:22 18      Q.  Now, he complained about all the cars going up
18:22 19  and down the easement and all that dust that was --
18:22 20      A.  On several occasions.  On several occasions,
18:22 21  yes.
18:22 22      Q.  And that was a main complaint that he made to
18:22 23  you.  Of anything that he said, the main complaint was
18:22 24  "That dust from that easement is really hurting me and
18:22 25  my family," right?
```

Case 1:01-cv-00105   Document 25   Filed in TXSD on 12/27/2001   Page 27 of 45

**25**

```
18:2?  1    A.   ... he talked about that, yes, sir.
18:2?  2    Q.   Now, sir, I understand that you as a police
18:2?  3  officer remain a police officer 24 hours a day; and you
18:2? 4 know -- did Mr. Jonas ever tell you to go and direct
18:2? 5 the cars that were parking on the frontage road, to
18:2? 6 direct them to the traffic -- to the parking lot in the
18:2? 7 back?
18:23 8    A.   Cars that were parking on the frontage road?
18:23 9    Q.   Yeah.
18:23 10    A.   No, sir.
18:23 11    Q.   Now, did you ever go cite any of the those cars
18:23 12 that were parking on the frontage road with parking
      13 citations?
18:23 14    A.   No, what we do is we call a patrol unit that's
18:23 15 on duty; and that's done very often.
18:23 16    Q.   I understand what might be done.  What I'm
18:23 17 asking is what you did.  You're a police officer.
18:23 18 You're in uniform.  You have the authority to go and
18:23 19 issue parking citations to all those vehicles, right?
18:23 20    A.   Yes, I do.
18:23 21    Q.   And you don't do it?
18:23 22    A.   I don't do it.
18:23 23    Q.   In the year and a half that you -- and you've
18:23 24 seen vehicles parked illegally on the frontage road,
      25 correct?
```

**26**

```
18:23 1    A.   Yes, I have.
18:23 2    Q.   And you do not issue them citations?
18:23 3    A.   I don't carry citations out to the parking lot
18:23 4 over there.
      5    Q.   Okay.  You could?
18:23 6    A.   I could.
18:23 7    Q.   And it's gone on for an ongoing basis; and even
18:23 8 though you know it's going on, next week that you're
18:23 9 going to go work, you don't bring the citations to
18:23 10 maybe help try to prevent that problem?
18:23 11    A.   There are on-duty officers that do that.
18:23 12    Q.   I'm talking about you, sir.
18:23 13    A.   No, I don't do that because there are.
18:23 14    Q.   Now, here is Mr. Silva.  He sees a law
18:23 15 enforcement officer.  He sees people breaking the law
18:24 16 up and down, and he sees a law enforce officer not
18:24 17 willing to cite those vehicles that are parked
18:24 18 illegally.  For whatever reason, you're relying on
18:24 19 somebody else, isn't it a perception -- maybe it's
18:24 20 wrong -- but the perception that "Wait a minute.  Why
18:24 21 do Gomez's police officers let these guys park in
18:24 22 front?"  Don't you think that that's a perception that
18:24 23 could be made?
      24    A.   Are you talking about --
18:24 25         MR. QUINTANILLA:  Objection to form.
```

**27**

```
18:24 1    A.   Are you talking about the frontage road in
18:24 2 front of his house?
18:24 3    Q.   The frontage road all up and down that flea
      4 market all the way to the front of his house, yes, sir.
18:24 5    A.   I've never seen a vehicle parked in front of
18:24 6 his house.
18:24 7    Q.   You've never seen vehicles parked in front of
18:24 8 his house?
18:24 9    A.   No, other than his trucks.
18:24 10    Q.   If I showed you all these pictures that show
18:24 11 them there, you're going to say that that didn't really
18:24 12 happen?
18:24 13    A.   I'm saying I've never seen that.  I have never
18:24 14 seen that.
18:24 15    Q.   You've seen them parked in front of the flea
18:24 16 market?
18:24 17    A.   Yes, I have.
18:24 18    Q.   Okay.  Now, Mr. Gomez -- I'm sorry.  Mr. Silva
18:24 19 has got trucks that park on the frontage road, he's
18:25 20 cited immediately.  They tell him to move.
18:25 21    A.   I've never -- I've never cited the man.
      22    Q.   Not you, but by a police officer.
      23         MR. QUINTANILLA:  Objection to form.
18:25 24    Q.   Mr. Gomez has all these cars parked every
18:25 25 single weekend, two days a week, parked all over the
```

**28**

```
18:25 1 place, and you, an officer -- I mean, whether you see
18:25 2 them or not, you, an officer, can see them.  I mean, is
18:25 3 it unreasonable for him to think that maybe Mr. Gomez
18:25 4 is getting favorable treatment because nobody is citing
18:25 5 all of his customers, but he's getting cited?
      6         MR. QUINTANILLA:  Objection to form.
18:25 7    A.   I'll repeat to you, I've never cited the man.
      8    Q.   I understand.
18:25 9    A.   And I've seen several officers cite people in
18:25 10 front of the flea market.
18:25 11    Q.   My question to you is whether it's a reasonable
18:25 12 perception on Mr. Silva's part, if he's being cited by
18:25 13 Brownsville police officers but all these vehicles that
18:25 14 park every weekend time and time again are not being
18:25 15 cited, isn't it a reasonable perception on his part to
18:25 16 say "Gomez is getting favorable treatment"?
      17         MR. QUINTANILLA:  Object to the form.
18:25 18    A.   No, it is not.
18:25 19    Q.   It's not a reasonable perception?
18:25 20    A.   No, sir.
18:25 21    Q.   If Mr. Gomez -- Silva calls the police
18:25 22 department and says, "There's all these cars that are
18:25 23 parked on the easement," and they tell him "We don't
18:25 24 care.  We're not going to do something about it," you
18:25 25 know, "You bitch too much and you complain too much at
```

**29**

18:25  1   I'm even qu---- o-- don't you think it's fair for him to
18:26  2   wonder w-- -s -i- complaints not being addressed?
18:26  3            M-. QUINTANILLA:  Object to the form.
18:26  4       A.   -on't -elieve -- I don't believe he'll get
18:26  5   that kind of a response, sir.
18:26  6       Q.   If -e did -- I'm not saying -- 'cause you're
18:26  7   not there listening.  And you're not there listening to
18:26  8   what the dispatchers tell him.  If that's the response,
18:26  9   if he testifies under oath that's the response he gets,
18:26 10   don't you think it's a fair perception of him to wonder
18:26 11   "Why is Mr. Gomez getting this favorable treatment"?
18:26 12            MR. QUINTANILLA:  Object to form.
18:26 13       A.   If Mr. Silva is getting such an answer from our
18:26 14   dispatch, then we've got a problem in dispatch because
18:26 15   I don't believe that happens.
18:26 16       Q.   Again, what we're talking about -- and I know
18:26 17   you're not there.  I'm asking you to assume certain
18:26 18   things are happening.  Don't you agree that's a fair
18:26 19   perception if he sees he's being cited but not
18:26 20   Mr. Gomez's customers?
18:26 21       A.   You're --
18:26 22       Q.   Wouldn't you wonder?
18:26 23            MR. QUINTANILLA:  Objection to form.
18:26 24       A.   You're asking me to assume?
      25       Q.   I'm asking you to assume, and I'm asking you

**30**

18:26  1   wouldn't you wonder about certain things like that?
18:26  2            MR. QUINTANILLA:  Object to form.
18:26  3       Q.   You wouldn't wonder?
18:26  4       A.   Your assumption is unrealistic; but if that
18:27  5   happened, yes, I would.
18:27  6       Q.   It's not something you would expect to happen
18:27  7   normally, correct?
18:27  8       A.   No, it wouldn't happen.
18:27  9       Q.   But just because certain things you don't
18:27 10   expect to happen, are not routine, doesn't mean they
18:27 11   don't happen, correct?
18:27 12            Let me give you an example, sir.
      13            MR. VILLEGAS:  Where is Mariano No. 1?
18:27 14   That's it right there.  Thank you.
18:27 15       Q.   Now, sir, I'd like for you to look at this
18:27 16   report.  It says, "Estimated date of occurrence, 7/12."
18:27 17   You would have expected this report to have been
18:27 18   written somewhere around 7/12 in the normal routine
18:27 19   course of business, correct?
18:27 20       A.   Yeah.
18:27 21       Q.   Would you have?
18:27 22       A.   Yes, that's what I said.
18:27 23       Q.   Okay.  'Cause that's what it says, "estimated
18:27 24   date of occurrence."  And usually if it's an estimated
18:27 25   date of occurrence, the report is written somewhere

**31**

18:27  1   around there, correct?
18:27  2       A.   Yes.
18:27  3       Q.   Unless it's a real -- there is some special
18:27  4   circumstance, right?
18:27  5       A.   Okay.
18:27  6       Q.   And I want you to look at what Mr. Mariano
18:28  7   wrote, that on September the 3rd, 1998, he's called by
18:28  8   his boss, Basilio Gomez, to inquire about an incident
18:28  9   that occurred on July 12th, 1998, that he wasn't
18:28 10   present -- he's testified under oath, Mr. Gonzalez has
18:28 11   testified, "I wasn't present when what's discussed here
18:28 12   transpired, but I'm asked by my boss to inquire about
18:28 13   something that happened more than 45 days before."
18:28 14   That's not routine, is it?
18:28 15       A.   It happens.
18:28 16       Q.   It happens.
18:28 17       A.   It happens.
18:28 18       Q.   But it's not routine!
18:28 19       A.   It's not routine, but it happens.
18:28 20       Q.   How many times have you written a report 45
18:28 21   days later on something you didn't personally witness
18:28 22   but just because your boss tells -- somebody asks you
18:28 23   other than a law enforcement official to write it up?
18:28 24       A.   This is an incident report.
18:28 25       Q.   I understand.  Whatever it is.  I'm just asking

**32**

18:28  1   you.
18:28  2       A.   This is a complaint placed by a complainant,
18:28  3   and all we do is make an incident report.  This is not
18:29  4   a report of anything other than the complainant states
18:29  5   that this happened.  That's all this is.
18:29  6       Q.   Well, but what it says here -- this may be an
18:29  7   incident report; and I asked you, first of all, how
18:29  8   many times have you written up an incident report 45
18:29  9   days later on an incident you didn't personally see?
18:29 10       A.   45 days later?
      11            MR. QUINTANILLA:  Objection to form.
18:29 12       A.   Never.
18:29 13       Q.   Now.  We've got an incident that occurs.  45
18:29 14   days later Mr. Gonzalez is contacted by Basilio Gomez.
18:29 15   Basilio Gomez is the man that's paying him on weekends
18:29 16   to do security.
18:29 17       A.   Okay.
18:29 18       Q.   He says, "I want you to look at something that
18:29 19   happened July 12, 1998."  Mr. Gonzalez goes and talks
18:29 20   to another officer who himself got the information
18:29 21   hearsay.  Wouldn't it have been routine for that
18:29 22   officer who really saw it all transpire write this
18:29 23   up --
18:29 24            MR. QUINTANILLA:  Object to the form.
18:29 25       Q.   -- rather than Mr. Gonzalez?

**45**

18:43 1 he'd seen complaints about that water hose running,
18:43 2 correct, sir?
18:43 3    A.  Yes, sir.
18:43 4    Q.  From several different citizens?
18:43 5    A.  Yes, sir.
18:43 6    Q.  Okay.  And this was during the time that it had
18:43 7 not rained?
18:43 8    A.  Yes, sir.
18:43 9    Q.  There hadn't been any rain for several months,
18:43 10 you told us?
18:43 11    A.  Yes, as I recall.
18:43 12    Q.  All right.  So you discount any theory or any
18:43 13 argument that Mr. Silva has that "I was getting water
18:43 14 or sucking water out of my back yard"?
18:43 15    A.  Yes, sir.
18:43 16    Q.  Okay.  You just don't buy that, do you?
18:43 17    A.  I just don't, no.
18:43 18    Q.  You don't believe that, do you, Officer
18:43 19 Zamorano?
18:43 20    A.  I don't.
18:43 21    Q.  Okay.  And you have -- you're also an officer
18:43 22 that has received comments or accusations from this
18:43 23 gentleman, from Mr. Silva, that you are corrupt, right,
18:43 24 or that the City of -- the police department is
18:43 25 corrupt?

**46**

18:43 1    A.  Yes, sir.
18:43 2    Q.  Do you find those comments to be offensive,
18:43 3 sir?
18:43 4    A.  Yes, sir.
18:43 5    Q.  Okay.  You're out there trying to protect the
18:43 6 citizens of Brownsville, are you not?
18:44 7    A.  Yes, sir.
18:44 8    Q.  And trying to make that everything -- they
18:44 9 behave in an orderly fashion, do you not?
18:44 10    A.  That's my goal.
18:44 11    Q.  And yet you have a gentleman like him accusing
18:44 12 you of being corrupt?
18:44 13    A.  Yes, I do.
18:44 14    Q.  Do you find that to be offensive?
18:44 15    A.  Yes, sir.
18:44 16    Q.  Any of those comments or accusations, are
18:44 17 there -- is there any truth to that, Officer Zamorano?
18:44 18    A.  No, not in the least.
18:44 19    Q.  You've worked for the Brownsville Police
18:44 20 Department for three and a half years?
18:44 21    A.  Yes, sir.
18:44 22    Q.  During the entire time that you've worked there
18:44 23 for those three and a half years, have you ever
18:44 24 witnessed or seen any fellow officer breaking the law?
18:44 25    A.  No, I have not.

**47**

18:44 1    Q.  Have you seen any officer being corrupt?
18:44 2    A.  No, I have not.
18:44 3    Q.  Okay.  So if -- would you find those comments
18:44 4 to be offensive?
18:44 5    A.  Yes, sir.
18:44 6         MR. VILLEGAS:  Object to form.
18:44 7    Q.  And have you ever -- have you yourself or any
18:44 8 fellow officer ever conspired with Mr. Gomez,
18:45 9 Mr. Basilio Gomez, to violate any state or federal law
18:45 10 out there in the flea market?
18:45 11    A.  No, sir, I have not.
18:45 12    Q.  Or have you ever conspired, you or any fellow
18:45 13 officer ever conspired with Mr. Basilio Gomez to
18:45 14 violate any city ordinance or city code out there at
18:45 15 the flea market?
18:45 16    A.  Never.
18:45 17    Q.  And if somebody was to accuse you of doing
18:45 18 that, would you find that to be offensive, Officer
18:45 19 Zamorano?
18:45 20    A.  Yes, sir.
18:45 21    Q.  And if Mr. Silva accused you of that, would you
18:45 22 find that to be offensive?
18:45 23    A.  I would, definitely.
18:45 24    Q.  And you have told us earlier that Mr. Silva
18:45 25 here, Mr. Jesus Silva, actually complained to you that

**48**

18:45 1 he was being injured or physically harmed because of
18:45 2 the dust?
18:45 3    A.  His property.
18:45 4    Q.  Or his property or himself?
18:45 5    A.  His property.
18:45 6    Q.  Okay.  Did he ever say "My family is" -- "has
18:46 7 been physically harmed or has gotten sick because of
18:46 8 the dust"?
18:46 9    A.  No, sir.
18:46 10    Q.  Okay.  Or himself, for that matter.  Did he
18:46 11 ever complain to you about that?
18:46 12    A.  No, sir, he didn't.
18:46 13    Q.  And I'm talking about where he has come up to
18:46 14 you and complained that the dust is making himself or
18:46 15 his wife or his kids sick.
18:46 16    A.  He has never said anything to me about that.
18:46 17    Q.  And he's had opportunity to tell you that, has
18:46 18 he not?
18:46 19    A.  Yes, sir.
18:46 20    Q.  'Cause you've been out there on Sundays, don't
18:46 21 you -- weren't you?
18:46 22    A.  Yes, sir.
18:46 23    Q.  Primarily on Sundays?
18:46 24    A.  Primarily.  A couple of Saturdays, but
18:46 25 primarily Sundays.

49

18:45  1      Q.   ... As you have told us earlier, Officer
18:45  2  Zamorano that, in fact, several of your fellow
18:45  3  officers have cited customers there at the flea market
18:45  4  before, have they not?
18:45  5      A.   Yes, sir.
18:45  6      Q.   Okay.  You're not playing favorites with
18:46  7  anybody, are you?
18:46  8      A.   Absolutely not.
18:46  9      Q.   If Mr. Silva comes to you with a complaint, are
18:46 10  you going to entertain it and see to it that it's taken
18:47 11  care of?
18:47 12      A.   Most definitely.
18:47 13      Q.   Okay.  And if you don't -- if you don't do that
18:47 14  yourself, you call in a patrol unit?
18:47 15      A.   Yes, sir.
18:47 16      Q.   And that is the standard practice and policy of
18:47 17  the Brownsville Police Department?
18:47 18      A.   Yes, sir.
18:47 19      Q.   When you're out there working security?
18:47 20      A.   Yes, sir.
18:47 21      Q.   Okay.  Has Mr. Gomez, Basilio Gomez, or his
18:47 22  sons, ever asked you not to issue tickets to the people
18:47 23  that park on the frontage?
18:47 24      A.   No, never.
18:47 25      Q.   Have they ever offered you money or a promise

50

18:47  1  to increase in pay, your pay, if you didn't cite those
18:47  2  people that parked on the frontage?
18:47  3      A.   No, never.
18:47  4      Q.   Okay.  And if somebody was to do that, to offer
18:47  5  you money to turn the other way, would you do that,
18:47  6  sir?
18:47  7      A.   No, sir, I would not.
18:47  8      Q.   That could lead to your suspension or possible
18:47  9  dismissal from the force?
18:47 10      A.   Absolutely, yes, sir.
18:47 11      Q.   You take that seriously, don't you?
18:47 12      A.   Yes, sir, I do, very much so.
18:47 13      Q.   Now, Officer, as a police officer do you always
18:47 14  have to personally witness an incident to be able to
18:48 15  document it in one of these incident reports?
18:48 16      A.   No, sir, I do not.
18:48 17      Q.   In fact, the majority of the time, if not all
18:48 18  of the time, an officer doesn't do that, right?  They
18:48 19  don't personally witness something?
18:48 20      A.   That's correct.
18:48 21      Q.   And that's very true like of situations with
18:48 22  auto accidents, where, obviously, the officer gets
18:48 23  called or dispatched after the fact?.
18:48 24      A.   Yes, sir.
18:48 25      Q.   Right?

51

18:48  1      A.   Yes, sir.
18:48  2      Q.   And just because you didn't personally witness
18:48  3  the incident doesn't mean that you're going to not
18:48  4  prepare an incident report; is that correct?
18:48  5      A.   That's correct.
18:48  6      Q.   Okay.  If somebody asks you to prepare an
18:48  7  incident report, then it's your job and obligation to
18:48  8  do that, sir; is that correct?
18:48  9      A.   Yes, sir, it is.
18:48 10      Q.   Have you ever been asked by Mr. Jesus Silva or
18:48 11  his brother, for that matter, to document something, a
18:48 12  complaint, and you failed to do that?
18:48 13      A.   No, sir.
18:48 14      Q.   Or you have failed to help them and call a
18:48 15  patrol unit to do that?
18:49 16      A.   Never.
18:49 17      Q.   Or you have turned the other way and ignored
18:49 18  him?
18:49 19      A.   No, absolutely not.
18:49 20      Q.   Or that you have told him, "You know what, you
18:49 21  guys are just complainers.  Get out of here"?
18:49 22      A.   Absolutely not, would never.
18:49 23      Q.   All right.  Now, is it -- is there anything
18:49 24  illegal about this report that you were shown right
18:49 25  here, that Officer Mariano Gonzalez prepared?

52

18:49  1      A.   Is there anything illegal about it?
18:49  2      Q.   Illegal about it.
18:49  3      A.   No, sir.
18:49  4      Q.   You're telling us that it might not be routine,
18:49  5  right?
18:49  6      A.   Exactly.
18:49  7      Q.   But, I mean, whether it's routine or not, that
18:49  8  doesn't matter here, sir; is that correct?
18:49  9      A.   That's correct.
18:49 10      Q.   Okay.  Is it against public -- the policy of
18:49 11  the Brownsville Police Department to go back and
18:49 12  document things like that?
18:49 13      A.   No, sir, it is not.
18:49 14      Q.   Where a report talks about something that
18:49 15  happened 45 days ago or so?
18:49 16      A.   It's not against policy.
18:49 17      Q.   I don't want the jury to get the impression
18:49 18  that this report is illegal.
18:49 19      A.   No, it is not by any means.
18:49 20      Q.   Okay.  What you told us earlier is that it
18:50 21  might not happen all the time, and it happens very
18:50 22  rare; but it does happen, and there is nothing illegal
18:50 23  about that, right, Officer?
18:50 24      A.   That's correct.
18:50 25      Q.   Now, were you present, Officer Zamorano, when

Case 1:01-cv-00105   Document 25   Filed in TXSD on 12/27/2001   Page 31 of 45

**53**

18:50 1  Mr. Silva ... Silva complained that his Suburban was
18:50 2 damaged?
18:50 3    A. ... sir was.
18:50 4    Q. ... were there? You actually saw the Suburban?
18:50 5    A. Yes, sir.
18:50 6    Q. What year's Suburban was it, sir, to your
18:50 7 recollection?
18:50 8    A. An estimation?
18:50 9    Q. Yes, sir.
18:50 10   A. Maybe early '90s.
18:50 11   Q. Okay. Was it fairly good, in good condition?
18:50 12   A. Other than the damage, yes.
18:50 13   Q. Okay. Now, isn't it true, Officer Zamorano,
18:51 14 that that damage to the Suburban was very minimal, sir,
18:51 15 from what you remember?
18:51 16   A. It was -- it wasn't a great amount of damage,
18:51 17 no.
18:51 18   Q. Okay. You're familiar with the vehicle damage
18:51 19 ratings, are you not, sir?
18:51 20   A. Yes, sir.
18:51 21   Q. What damage rating would you have given it,
18:51 22 Officer Zamorano?
18:51 23   A. That would be a 2.
18:51 24   Q. A 2?
18:51 25   A. Yes, sir.

**54**

18:51 1    Q. Okay. And what part -- what part of the
18:51 2 Suburban was damaged?
18:51 3    A. The driver's side door -- the passenger side
18:51 4 door. I'm sorry.
18:51 5    Q. The passenger side door?
18:51 6    A. Yes, sir.
18:51 7    Q. Okay. Whereabouts was the passenger side door
18:51 8 damaged?
18:51 9    A. In the middle, right smack in the middle.
18:51 10   Q. Smack in the middle?
18:51 11   A. Yes, sir.
18:51 12   Q. Do you know what caused that damage?
18:51 13   A. No, I do not.
18:51 14   Q. You were not present, were you?
18:51 15   A. No, sir, I was not.
18:51 16   Q. What did Mr. Silva tell you or Detective Lucio
18:51 17 that caused that damage to the Suburban?
18:51 18   A. It was a hit and run vehicle.
18:52 19   Q. Did Mr. Silva, Jesus Silva, tell you or
18:52 20 Detective Lucio what kind of vehicle damaged the
18:52 21 Suburban?
18:52 22   A. No, sir, I don't recall that happening.
18:52 23   Q. Okay. And you're telling us it was a hit and
18:52 24 run, or he told you that it was a hit and run?
18:52 25   A. Yes, sir.

**55**

18:52 1    Q. You didn't see any vehicles speed out of there
18:52 2 or anything like that?
18:52 3    A. No, sir, I did not.
18:52 4    Q. Now, have you been promised any compensation or
18:52 5 offered any money for you to testify a certain way here
18:52 6 today, sir, by Mr. Gomez and his family?
18:52 7    A. No, sir.
18:52 8    Q. Did you meet with Mr. Gomez ahead of time and
18:52 9 get you to testify a certain way or that this is what
18:52 10 they were going to ask you about here today, sir?
18:52 11   A. No, sir.
18:52 12   Q. Okay. What you're telling us here is the
18:53 13 truth?
18:53 14   A. Yes, sir.
18:53 15   Q. Have you lied under oath, Officer Zamorano?
18:53 16   A. No, sir, I have not.
18:53 17   Q. Now, excuse me if I've asked you this question
18:53 18 before. But who owns the frontage road that's on --
18:53 19 parallel to the expressway out there by the flea
         20 market?
18:53 21   A. Who owns the frontage road?
18:53 22   Q. Yeah.
18:53 23   A. The City.
18:53 24   Q. Okay. To your knowledge does either the flea
18:53 25 market or Mr. Basilio Gomez own that frontage road?

**56**

18:53 1    A. No, sir.
18:53 2    Q. Okay. So if vehicles park along side the
18:53 3 frontage road, is that Mr. Gomez's fault?
18:53 4    A. No, sir, it is not.
18:53 5    Q. Have you ever heard Mr. Gomez specifically tell
18:53 6 any of the customers or vendors to park on the frontage
18:53 7 road because the police are not going to do anything
18:54 8 about it anyway?
18:54 9    A. No, never.
18:54 10       MR. QUINTANILLA: I have nothing further.
18:54 11 Thank you, sir.
       12        REEXAMINATION
       13 BY MR. VILLEGAS:
18:54 14   Q. A couple of questions, sir. How many times
18:54 15 have you called the patrol units to come and issue
18:54 16 citations in the past year there at the flea market?
18:54 17   A. To come issue citations on the expressway?
18:54 18   Q. On the vehicles that are parked illegal on the
18:54 19 frontage road?
18:54 20   A. Have I personally called for them? No, sir.
18:54 21   Q. Okay. Now, even though you saw them there, you
18:54 22 didn't make that decision to call the police -- the
18:54 23 patrol units who could come and issue citations,
18:54 24 correct?
18:54 25   A. No, sir, I did not.

VS                                    §        OF THE CITY OF BROWNSVILLE

**JESUS MARIA SILVA**                 §        CAMERON COUNTY TEXAS

## STATE'S MOTION TO DISMISS

COMES NOW, THE STATE OF TEXAS, by her County (Criminal District) Attorney, and moves the Court to dismiss the above entitled and numbered cause against the above-named Defendant, for the following reasons:

DISMISSED TO BE FILED AS A FELONY ASSAULT ON A POLICE OFFICER.

Respectfully submitted,
Yolanda de León

By: _____
REBECCA E. RUBANE
Assistant County (Criminal District) Attorney
State Bar No. 24002873
974 E. Harrison Street
Brownsville, Texas 78520
(956) 544-0849

## ORDER OF DISMISSAL

ON THIS, the 24th day of _____May_____, 2000, came to be heard the written motion of the State's Attorney, filed herein, asking permission of the Court to dismiss this cause against the Defendant, **JESUS MARIA SILVA**, for the reasons set out in said Motion, and the same having been heard and duly considered, the Court is of the opinion that the reasons so stated are good and sufficient to authorize such dismissal

IT IS THEREFORE CONSIDERED, ORDERED and ADJUDGED by the Court, that this criminal action be, and the same hereby, dismissed as to the aforesaid Defendant

_____
JUDGE PRESIDING

Ex 6



05/19/00

# CAUSE NO. 00-B-1257
## RESISTING ARREST

| THE STATE OF TEXAS | § | IN THE MUNICIPAL COURT |
|---|---|---|
| VS | § | OF THE CITY OF BROWNSVILLE |
| JESUS MARIA SILVA | § | CAMERON COUNTY, TEXAS |

### STATE'S MOTION TO DISMISS

COMES NOW, THE STATE OF TEXAS, by her County (Criminal District) Attorney, and moves the Court to dismiss the above entitled and numbered cause against the above-named Defendant, for the following reasons:

DISMISSED TO BE FILED AS A FELONY ASSAULT ON A POLICE OFFICER

Respectfully submitted,
Yolanda de León

By: _____

REBECCA E. RUBANE
Assistant County (Criminal District) Attorney
State Bar No. 24002873
974 E. Harrison Street
Brownsville, Texas 78520
(956) 544-0849

### ORDER OF DISMISSAL

ON THIS, the 20 day of ___May___, 20__, came to be heard the written motion of the State's Attorney, filed herein, asking permission of the Court to dismiss this cause against the Defendant **JESUS MARIA SILVA**, for the reasons set out in said Motion, and the same having been heard and duly considered, the Court is of the opinion that the reasons so stated are good and sufficient to authorize such dismissal.

IT IS THEREFORE CONSIDERED, ORDERED and ADJUDGED by the Court, that this criminal action be, and the same hereby, dismissed as to the aforesaid Defendant

_____
JUDGE PRESIDING

05/19/00

# CAUSE NO. 00-B-1257
## RESISTING ARREST

Ex 6

05/19/00

## CAUSE NO. 00-B-1261
### EVADING DETENTION

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE MUNICIPAL COURT |
| VS | § | OF THE CITY OF BROWNSVILLE |
| JESUS MARIA SILVA | § | CAMERON COUNTY, TEXAS |

### STATE'S MOTION TO DISMISS

COMES NOW, THE STATE OF TEXAS, by her County (Criminal District) Attorney, and moves the Court to dismiss the above entitled and numbered cause against the above-named Defendant, for the following reasons:

THE STATE WILL PROCEED ON RESISTING CHARGES

Respectfully submitted,
Yolanda de León

By: _____
REBECCA E. RUBANE
Assistant County (Criminal District) Attorney
State Bar No. 24002873
974 E. Harrison Street
Brownsville, Texas 78520
(956) 544-0849

### ORDER OF DISMISSAL

ON THIS, the 20th day of _____ May _____, 20 00 came to be heard the written motion of the State's Attorney, filed herein, asking permission of the Court to dismiss this cause against the Defendant JESUS MARIA SILVA, for the reasons set out in said Motion, and the same having been heard and duly considered, the Court is of the opinion that the reasons so stated are good and sufficient to authorize such dismissal

IT IS THEREFORE CONSIDERED, ORDERED and ADJUDGED by the Court, that this criminal action be, and the same hereby, dismissed as to the aforesaid Defendant.

_____
JUDGE PRESIDING

Ex 6

NAMES OF WITNESSES

#118215

00-CR-0603-E

THE STATE OF TEXAS
vs
JESUS MARIA SILVA

# INDICTMENT

OFFENSE:

AGGRAVATED ASSAULT AND AGGRAVATED
ASSAULT AGAINST A PUBLIC SERVANT
(THREE COUNTS)

YOLANDA DE LEON
Criminal County Attorney

A TRUE BILL.

_____
Foreman of Grand Jury

Filed on _____ MAY 24 2000 19___

AURORA DE LA GARZA, CLERK OF
DISTRICT COURTS OF CAMERON
COUNTY, Texas

By _____ Deputy

Amount of Bail $ 3,000.00 U.S.

THE STATE OF TEXAS
COUNTY OF CAMERON

I, AURORA DE LA GARZA, Clerk of the District Courts of Cameron County, Texas, do hereby certify
that the within and fore-
going is a true and correct copy of the Original Bill of Indictment, filed in said Court on _____

in Cause No. _____ styled the State of Texas vs _____
_____ A. D. 19 ___

Given under my hand and seal of said court, at office in Brownsville, Texas, this _____ day
of _____, A. D. 19 ___

AURORA DE LA GARZA, Clerk

By _____ Deputy

Ex 7

NAMES OF WITNESSES

#118235

---

**00-CR-0603-E**

# THE STATE OF TEXAS

JESUS MARIA SILVA

# INDICTMENT

OFFENSE:

**AGGRAVATED ASSAULT AND AGGRAVATED ASSAULT AGAINST A PUBLIC SERVANT (THREE COUNTS)**

YOLANDA DE LEON
Criminal County Attorney

A TRUE BILL:

_____
Foreman of Grand Jury

Filed on ....... MAY 2 4 2000 ....... 19

AURORA DE LA GARZA, CLERK OF
DISTRICT COURTS OF CAMERON
COUNTY
By ................................... Deputy

Amount of Bail $ 53,000.00 US

---

THE STATE OF TEXAS
COUNTY OF CAMERON

I, AURORA DE LA GARZA, Clerk of the District Courts of Cameron County, Texas, do hereby certify
that the within and fore-
Being a true and correct copy of the Original Bill of Indictment, filed in said Court on

_____ styled the State of Texas vs

_____ in Cause No. _____ A. D. 19

Given under my hand and seal of said court, at office in Brownsville, Texas, this _____ day

of _____ A. D. 19

AURORA DE LA GARZA, Clerk

By _____ Deputy

IN THE DISTRICT COURT OF CAMERON COUNTY, TEXAS

357th JUDICIAL DISTRICT

THE STATE OF TEXAS          §

VS.                         §

Jesus Maria Silva           §          NO. 00-CR-1603-E

M O T I O N   T O   D I S M I S S

TO THE SAID HONORABLE COURT:

Now comes the State of Texas by and through her Assistant District Attorney and moves the Court to dismiss the above entitled and numbered cause for the reason that:

```
_____ 1.  The evidence is insufficient
_____ 2.  The defendant was convicted in another cause
_____ 3.  The complaining witness has requested dismissal
_____ 4.  The cause has been re-indicted and refiled
_____ 5.  Case dismissed - operation of law (P.C. 12.45)
_____ 6.  Subsequent investigation shows defendant is a juvenile
_____ 7.  Indictment alleges alternative counts, defendant pleaded
           guilty to one count
_____ 8.  Multi-count indictment, defendant pleaded guilty to one
           or more counts
_____ 9.  Necessary witness(es) cannot be located.
_____ 10. Evidence suppressed or suppressible
_____ 11. Other
```

and for cause would show the Court the following:

*In accordance with the plea agreement, the defendant was sentenced on a class "A" assault, in cause# 00-CCR-6918-C.*

Respectfully submitted,

*Rebecca E. RuBane*
Assistant District Attorney

O R D E R

The above entitled and numbered cause is hereby dismissed on the foregoing motion for the reasons herein above stated.

ENTERED this 6th day of _____, 2000.

_____
J U D G E

cc to:   State
         Defense Counsel
         Sheriff's Dept.
         Jail
         Other

Ex 8

Case 1:01-cv-00105  Document 25  Filed in TXSD on 12/27/2001  Page 38 of 45

# MEDICAL INSTITUTE OF SOUTH TEXAS
## P.O. BOX 6199  MCALLEN, TX  78502
### (956) 631-6109 * FAX (956) 631-6125

# FAX COVER SHEET

PLEASE DELIVER THE FOLLOWING PAGES TO:

NAME: _Jesus Silva_

COMPANY: _Albert Villegas  Atty  at Law_

FAX #: _544-7828_  PHONE # _____

DATE: _01-09-01_  TIME: _11:00 Am_

TOTAL NUMBER OF PAGES, INCLUDING COVER LETTER: _1_

COMMENTS: _Jesus Silva_

_Dr. Perry has recommended surgery for_
_Rt shoulder repair._
_Please advise as soon as possible as pt. is_
_pending for treatment._

_Thank You_
_Rita Celesta ___

### CONFIDENTIALITY STATEMENT

The documents accompanying this transmission contain information which is confidential, and/or privileged. the information is intended for the use of the individual, or entity to whom it is directed. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the contents of the faxed information is strictly prohibited. If you have received this fax in error, please notify us by telephone immediately so that we can arrange for the retrieval of the original documents at no cost to you.

## IF YOU DO NOT RECEIVE ALL THE PAGES, PLEASE CALL AT (956) 631-6109

Ex 9



Medical Institute of South Texas
711 Nolana Suite #103 McAllen, TX 78504
Phone:(956) 631-6109 Fax:(956) 631-6125

FRED PEREZ, M.D.

Name: _Jesus Silva_____ Date: _10-17-00_

Address: _____

Rx   CT of Brain w/o contrast
     MRI Right shoulder
     MRI L-spine

☐ Label
Refill _____ times PRN/NR

_____ M.D.

_____ M.D.

Ex 10

1

CAUSE NO. 98-11-4333-E

BASILIO C. GOMEZ, SR.   )(  IN THE DISTRICT COURT
      Plaintiff       )(
                      )(
VS.                 )(  CAMERON COUNTY, TEXAS
                      )(
JESUS SILVA SALAZAR AND  )(
JUAN ANTONIO SILVA     )(
SALAZAR             )(
      Defendants      )(  357TH JUDICIAL DISTRICT

---

ORAL DEPOSITION OF
BASILIO C. GOMEZ, SR.
APRIL 6, 1999

---

     ORAL DEPOSITION OF BASILIO C. GOMEZ, SR.,
produced as a witness duly sworn by me at the instance
of the DEFENDANT, taken in the above styled and
numbered cause on APRIL 6, 1999, from 11:17 a.m. to
2:17 p.m., before LOU ZUNIGA, Certified Shorthand
Reporter No. 2198 in and for the State of Texas, at the
offices of Ernesto Gamez, 777 East Harrison,
Brownsville, Texas, pursuant to the Texas Rules of
Civil Procedure.

COPY

BRYANT & STINGLEY, INC.
McAllen      Harlingen     Brownsville
(956)618-2366  (956)428-0755  (956)542-1020


Ex 11

4

|   |   |
|---|---|
| 1 | BASILIO C. GOMEZ, SR., |
| 2 | having been duly sworn, testified through the duly |
| 3 | sworn interpreter, as follows: |
| 4 | EXAMINATION |
| 5 | BY MR. VILLEGAS: |

10:17  6    Q.  Will you state your name for the record,
10:17  7  please.

10:18  8    A.  Basilio Gomez.

10:18  9    Q.  Are you also Basilio Gomez, Sr., sir?

10:18 10    A.  That's it.

10:18 11    Q.  I'm going to ask you some questions, and if you
10:18 12  will limit your answers to what I ask you, I will try
10:18 13  to get you out of here as quickly as possible.

10:18 14    A.  That's it.

10:18 15    Q.  Can you tell me -- you are the same Basilio
10:18 16  Gomez, Sr., that we deposed back four or five years
10:18 17  ago, correct?

10:18 18    A.  Yes.

10:18 19    Q.  Now, did you see Jesus Silva Salazar place any
10:18 20  roof tacks on the easement?

10:18 21    A.  No.

10:18 22    Q.  Who has told you that they saw Jesus Silva
10:19 23  Salazar place roof tacks or nails on the easement?

10:19 24    A.  Nobody told me.

10:19 25    Q.  Is it true, then, that there are no

10:26 1   that he would destroy the easement.  We have a picture
10:26 2   of that.
10:26 3       Q.  You know that he was pumping water out of the
10:26 4   back of his yard when it was flooding, right?
10:26 5       A.  Yes, but that water he was not throwing it on
10:26 6   the easement.  He made a drainage ditch that helped the
10:26 7   water go out, but the water from the three hoses was
10:26 8   being discharged on the easement.  I have pictures of
10:27 9   that.
10:27 10      Q.  Okay.  Let me ask you about Mr. Carlos Campos.
10:27 11  How do you know him?
10:27 12      A.  He's a seller that goes there to the flea
10:27 13  market.
10:27 14      Q.  Have you ever been to his home?
10:27 15      A.  No.
10:27 16      Q.  Have you ever paid him any money?
10:27 17      A.  No.
10:27 18      Q.  Has he paid you any money?
10:27 19      A.  To me, no.
10:27 20      Q.  To your sons?
10:27 21      A.  No.  That I know of, no.
10:27 22      Q.  Are you paying the police officers that are out
10:27 23  there directing traffic?
10:27 24      A.  Yes, that's it.
10:27 25      Q.  How did you contract with these police

10:27  1   officers?

10:28  2       A.  I pay them by the hour.

10:28  3       Q.  And do you pay each individual police officer?

10:28  4       A.  Yes.

10:28  5       Q.  And how did you find out which police officers

10:28  6   would come out and do this work for you?

10:28  7       A.  Because I see them.

10:28  8       Q.  Did any of your sons help you hire those police

10:28  9   officers?

10:28 10       A.  They offered their services, and we contracted

10:28 11   them by way of Gonzalez.

10:28 12       Q.  Who is Gonzalez?

10:28 13       A.  He's the brother of Aurora, Mariano Gonzalez.

10:29 14   He was the one that got them for us, and he also works

10:29 15   there.  He has them as companions for himself.

10:29 16       Q.  You paid them with cash or check?

10:29 17       A.  By check.

10:29 18       Q.  And what is the account under that check -- the

10:29 19   name of the account?

10:29 20       A.  77 Flea Market.

10:29 21       Q.  Is the 77 Flea Market owned by you individually

10:29 22   or by your wife as well?

10:29 23       A.  Individually.

10:29 24       Q.  Okay.  Is that a corporation?

10:29 25       A.  No, it's a private party, mine.

12:01  1        A.   When it has inundated on account of rain, I

12:01  2   have had to do it.

12:01  3        Q.   Who used to do -- what other companies or

12:01  4   persons used to haul off the sewage for you?

12:01  5        A.   First Bridge Water, a long time ago, and then

12:01  6   Ruben's.

12:01  7        Q.   Anybody else?

12:01  8        A.   That's all.  There's no one in Brownsville that

12:02  9   does it.

12:02 10        Q.   Now, how long had you been dumping that sewage

12:02 11   on the other side of the freeway on your personal

12:02 12   property?

12:02 13        A.   Only when it has rained, when it has become

12:02 14   inundated.

12:02 15        Q.   For the past two or three years every time

12:02 16   there was a lot of water you would go and take it over

12:02 17   there and dump it?

12:02 18        A.   No, not two or three years, only when it has

12:02 19   rained in excess.

12:02 20        Q.   When it has rained in excess for the past two

12:02 21   or three years you have done that?

12:03 22        A.   It must have been five or six times.

12:03 23        Q.   You would agree that the -- that there was an

12:03 24   odor that came from the septic tanks around those

12:03 25   bathrooms?

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

1     Q.  But you know the cars park on the frontage --

12:31  2   up and down the frontage in front of your flea market

12:31  3   and in front of Mr. Silva's property, right?

12:32  4     A.  Yes.  Yes, they park there because they want.

12:32  5   I do not charge in the parking.  Over there they do

12:32  6   charge them.  That's their problem.

12:32  7     Q.  Why don't you tell the policemen to direct all

12:32  8   those people to the back?

12:32  9     A.  The policemen have enough leaders already.

12:32  10  It's not for me to tell them.

12:32  11    Q.  Well, you are the one that pays them out there,

12:32  12  right?

12:32  13    A.  A minimum part.

12:32  14    Q.  How much do you pay them an hour?

12:32  15    A.  $15, I think.

12:32  16    Q.  You don't deduct social security or any of

12:32  17  that, do you?

12:33  18    A.  No, because I don't know the reason for that.

12:33  19  Long & Chilton are the ones that have my accounting.

20              (Gomez, Sr. Exhibit No. 2 Marked).

12:33  21    Q.  For the record, we asked you to produce a

12:33  22  number of items.  We asked you to bring these items

12:33  23  that are marked in Exhibit No. 2.  You didn't bring any

12:34  24  documents today, correct?

12:34  25    A.  No.